**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

13 PAUL LENDING LLC

                              CASE NO. _____

           Plaintiff,

v.

NOVACCESS GLOBAL INC.

Serve: Dwain K. Irvin, CEO
NovAccess Global Inc.
459 Columbus Ave
New York, NY 10025
Email: dirvin@novaccessglobal.com


           Defendant.
_____/

## VERIFIED COMPLAINT

By and through its undersigned counsel, Plaintiff 13 PAUL LENDING LLC hereby brings this legal action against Defendant NOVACCESS GLOBAL INC. for damages for breach of contract, fraud in the inducement, specific performance, injunctive relief, and other relief as more particularly hereinafter set forth, and respectfully alleges as follows:

### PARTIES

1.      Plaintiff 13 PAUL LENDING LLC ("13 PAUL LENDING" or "Holder") is a limited liability company organized and existing under the Laws of the Commonwealth of Virginia, with its address at 1322 Hillside Ave, Suite 115, Harrisonburg VA 22801.

2.      Defendant, NOVACCESS GLOBAL INC. ("NOVACCESS" or "Borrower") is a corporation organized and existing under the Laws of the State of Colorado, with its office located at 459 Columbus Ave New York, NY 10025

## JURISDICTION AND VENUE

3.      The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are residents of different states and the amount in controversy exceeds $75,000.00. The Court also has jurisdiction under Virginia's longarm statute because Defendant has transacted business in this Commonwealth of Virginia which caused harm here. Further, Defendant Borrower has expressly consented to the jurisdiction of this Court by effect of that certain Securities Purchase Agreement entered into by and between Plaintiff and Defendant on August 16, 2023 ("Purchase Agreement") and that certain Convertible Promissory Note entered into by and between Plaintiff and Defendant on equal date ("Note") (together the "Investment Contracts"), which Investment Contracts are the basis of this action.

4.      Defendant expressly consented to venue in the Investment Contracts. Section 8 (a) of the Purchase Agreement and Section 4.6 of the Note provide, in relevant part, as follows:

> **Purchase Agreement**
>
> 8. Governing Law; Miscellaneous
>
> a. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in **the Circuit Court of Fairfax County, Virginia or in the Alexandria Division of the United States District Court for the Eastern District of Virginia.** The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any objection or defense based on lack of jurisdiction or venue or based upon *forum non conveniens*.
> (Emphasis added.) See a true copy of the Purchase Agreement attached hereto as Exhibit 1.
>
> **Note**
>
> **ARTICLE IV. MISCELLANEOUS**

4.6 Governing Law. Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the **Circuit Court of Fairfax County, Virginia or in the Alexandria Division of the United States District Court for the Eastern District of Virginia.** The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any objection or defense based on lack of jurisdiction or venue or based upon *forum non conveniens*.

(Emphasis added.) See a true copy of the Note attached hereto as Exhibit 2

## FACTS

5.      On August 16, 2023, Plaintiff and Defendant executed and delivered to each other the Purchase Agreement, which provided for certain issuance of, and conversion rights in and to the common stock of Defendant.

6.      Additionally on August 16, 2023 (the "Issue Date"), upon Plaintiff Holder's payment of Fifty-Five Thousand Dollars ($55,000.00) (the Principal Amount"), Defendant Borrower made, executed, and delivered to Plaintiff Holder the Note in the Principal Amount. Defendant sent an instruction letter to its transfer agent stating: "You are hereby irrevocably authorized and instructed to establish an initial reserve of 3,655,249 shares of common stock of the Company for issuance upon conversion of the Note in accordance with the terms thereof." Exhibit 3. On January 14, 2024, Plaintiff emailed Defendant asking if Defendant had reserved more shares for Plaintiff and when Defendant planned on filing a quarterly report. Exhibit 4. Defendant never replied.

7.      Pursuant to the initial paragraph of the Note, Defendant Borrower promised to pay to the order of Plaintiff Holder the Principal Amount together with any interest, on August 16, 2024 (the "Maturity Date"), and to pay interest on the unpaid principal balance at the rate of

eight percent (8%) (the "Interest Rate") per annum from the Issue Date until the Note became due and payable, whether at maturity or upon acceleration or by prepayment or otherwise. Exhibit 2 at p.1.

8. The Note further provides that "[a]ny amount of principal or interest on the Note which is not paid when due shall bear interest at the rate of twenty two percent (22%) per annum from the due date thereof until the same is paid ("Default Interest")." *Id.*

9. Section 1.1 of the Note grants Plaintiff conversion rights in and to the common stock of Defendant. Section 1.1 provides in relevant part as follows:

> 1.1*Conversion Right*. The Holder shall have the right from time to time, and at any time during the period beginning on the date which is one hundred eighty (180) days following the date of this Note and ending on the later of: (i) the Maturity Date, or (ii) the date of payment of the Default Amount (as defined in Article III), each in respect of the remaining outstanding amount of this Note **to convert all or any part of the outstanding and unpaid amount of this Note into fully paid and non-assessable shares of Common Stock,** as such Common Stock exists on the Issue Date, or any shares of capital stock or other securities of the Borrower into which such Common Stock shall hereafter be changed or reclassified at the conversion price (the "Conversion Price") determined as provided herein (a "Conversion").

(Emphasis added.) *Id*. See Exhibit 2 at p. 1.

10. Accordingly, Plaintiff Holder was permitted to start conversion on February 12, 2024, and the conversion was made on April 6, 2024.

11. Section 1.3 of the Note requires Defendant Borrower to, at all times, have authorized and reserved six (6) times the number of shares that would be issuable upon full conversion of the Note in effect from time to time (the "Reserved Amount"). The Reserve Amount on the Issue Date was Three Million Six Hundred Fifty-Five Thousand Two Hundred Forty-Nine (3,655,249) shares. Further, the Note provides that at any time the Borrower does not maintain

the Reserved Amount it will be considered an Event of Default under Section 3.2 of the Note (as more fully described below).

12. Section 1.4(c) of the Note provides that upon receipt by Defendant Borrower from Plaintiff Holder of a Notice of Conversion, Defendant Borrower "shall issue and deliver to Plaintiff Holder certificates for the Common Stock issuable upon such conversion within three (3) business days after such receipt (the "Deadline")." *Id.* at p. 3.

13. Section 1.4(e) of the Note provides that if delivery of the Common Stock issuable upon conversion of this Note is not delivered by the Deadline due to action and/or inaction of Defendant Borrower, Defendant Borrower "shall pay to the Plaintiff Holder Two Thousand Dollars ($2,000) per day in cash, for each day beyond the Deadline that the Borrower fails to deliver such Common Stock (the "Fail to Deliver Fee")." Such cash amount shall be paid to Holder by the fifth day of the month following the month in which it has accrued or, at the option of the Holder (by written notice to the Borrower by the first day of the month following the month in which it has accrued), shall be added to the principal amount of this Note, in which event interest shall accrue thereon in accordance with the terms of this Note and such additional principal amount shall be convertible into Common Stock in accordance with the terms of this Note. The Borrower agrees that the right to convert is a valuable right to the Holder. The damages resulting from a failure, attempt to frustrate, interference with such conversion right are difficult if not impossible to qualify. Accordingly, the parties acknowledge that the liquidated damages provision contained in this Section 1.4(e) are justified.

*Id.* at p. 3.

DEFENDANT BORROWER'S EVENTS OF DEFAULT

14. Failure to Maintain the Reserved Amount. On February 1, 2024 (Exhibit 5) and again on July 29, 2024, Plaintiff served upon Defendant Borrower a Notice of Default for failure

to maintain the Reserved Amount. Defendant issued a Form 8-K acknowledging the February default (Exhibit 6). On information and belief, starting on or before October 11, 2023 and continuing as of the date of this correspondence, Defendant Borrower has not maintained the Reserved Amount in violation of Section 1.3 of the Note. The following chart illustrates the deficit in the Reserved Amount.

| Date (2023-2024) | Closing Price | Reserves Required | Actual Shares Reserved |
|---|---|---|---|
| October 11 | 0.060 | 5,567,506 | 3,655,249 |
| October 24 | 0.0559 | 5,992,677 | 3,655,249 |
| October 27 | 0.05 | 6,704,153 | 3,655,249 |
| November 1 | 0.0350 | 9,587,694 | 3,655,249 |
| November 6 | 0.040 | 8,398,273 | 3,655,249 |
| November 7 | 0.0340 | 9,882,450 | 3,655,249 |
| November 8 | 0.0315 | 10,669,066 | 3,655,249 |
| November 9 | .0280 | 12,005,282 | 3,655,249 |
| April 3 | 0.0125 | 29,015,659 | 2,255,249 |

15.     Failure to issue shares of Common Stock to Holder upon Exercise of Conversion Rights. On May 17th, 2024, Plaintiff Holder requested a conversion of 2,300,000 shares (Exhibit 7). On June 1, 2024 Plaintiff Holder was told by Defendant Borrower's transfer agent, Securities Transfer Corporation, that there were not enough shares reserved and only 1,955,249 shares were available (Exhibit 8). To date only 2,254,000 shares have been delivered, this Event of Default has not been cured. Accordingly, Defendant Borrower is required to pay Plaintiff Holder the Fail to Deliver Fee for each day beyond the Deadline.  Additionally, Section 3.2 of the Note provides, in relevant part, that an Event of Default occurs when Defendant Borrower "fails to issue shares of

Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights." *Id.* at p. 6. 15.

16. <u>Failure to Pay Principal and Interest Upon Maturity</u>. On August 16, 2024, 13 Paul Lending served upon Defendant Borrower a Notice of Default regarding Defendant Borrower's failure to pay on the Maturity Date principal and interest as required by Section 3.1 of the Note. Section 3.1 of the Note provides, in relevant part, that an Event of Default occurs when Defendant Borrower "fails to pay the principal or interest when due on the Note, whether at maturity or upon acceleration, and such breach continues for a period of five (5) days after written notice from the Holder."

17. <u>Failure to File Quarterly and Annual Reports</u>. On January 2nd, 2024, Defendant Borrower filed a Form NT 10-K reporting it had not filed the company's annual report for Fiscal 2023 and, consequently, was in default of the Note. Additionally, on information and belief Defendant Borrower has not filed the company's 2024 Q4 Quarterly Report or Annual Report. Defendant is required by Section 4.g of the Securities Purchase Agreement to comply with the reporting requirements of the Exchange Act. In addition Section 3.8 of the Note provides in relevant part that an Event of Default occurs when "[t]he Borrower shall fail to  comply with the reporting requirements of the Exchange Act; and/or the Borrower shall cease to  be subject to the reporting requirements of the Exchange Act (whether through the filing of a  Form 15 with the SEC or for any other reason)." *Id.* at p. 7.

PLAINTIFF HOLDER'S REMEDIES

18. Regarding the occurrence and during the continuation of any Event of Default specified in Sections 3.1, 3.3, 3.4, 3.7, 3.8, 3.10, 3.11, 3.12, and/or 3.13, Section 3.14 the Note provides, in relevant part, as follows:

[T]he Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to 150% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Prepayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and (x) plus (z) any amounts owed to the Holder pursuant to Section 1.3 hereof (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x), (y) and (z) shall collectively be known as the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity.

See Exhibit 2 at p. 8.

19.     Regarding the occurrence and during the continuation of any Event of Default specified in Section 3.2, the Note provides, in relevant part, as follows:

UPON THE OCCURRENCE AND DURING THE CONTINUATION OF ANY EVENT OF DEFAULT SPECIFIED IN SECTION 3.2, THE NOTE SHALL BECOME IMMEDIATELY DUE AND PAYABLE AND THE BORROWER SHALL PAY TO THE HOLDER, IN FULL SATISFACTION OF ITS OBLIGATIONS HEREUNDER, AN AMOUNT EQUAL TO: (Y) THE DEFAULT AMOUNT (AS DEFINED HEREIN); MULTIPLIED BY (Z) TWO (2).

*Id*.

20. Additionally, pursuant to Section 1.4(e) Defendant Borrower must pay Plaintiff  Holder the Fail to Deliver Fee for each day beyond the Deadline (which was three (3) business days after  May 17th, 2024), or for each day from May 22nd, 2024 until the shares are delivered. As of March 31st, Defendant has failed to deliver the remaining shares, resulting in the accrual of the Fail to Deliver Fee at the rate of $2000 per day minus $25,000, which totals $1,331,000 to date

21. Pursuant to Article III of the Note, if the Borrower failed to pay the Default Amount within five (5) business days of written notice that such amount is due and payable, then the Holder has the right at any time, so long as the Borrower remains in default (and so long and to the extent that there are sufficient authorized shares ), to require the Borrower, upon written notice , to immediately issue, in lieu of all or a portion of the Default Amount as to which conversion is sought divided by the

Conversion Price then in effect. In light of the occurrence of the foregoing Events of Default, Plaintiff Holder is entitled to avail itself of all the remedies provided for in the Note

## COUNT I
### (BREACH OF CONTRACT - CONVERTIBLE PROMISSORY NOTE)

22.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1- 21 of this Complaint with the same force and effect as if fully set forth at length herein.

23.     By making the payments described in paragraphs 6 above, the Plaintiff fully performed its obligations under the Note and Agreement.

24.     Defendant failed to comply with its obligations under the Note as described above, and defaulted under both the Notes and the Agreements by:

    a.     Failing to maintain the Reserved Amount;

    b.     Failure to deliver common stock prior to deadline upon Plaintiff Holder's exercise of its conversion rights;

    b.     Failure to pay principal and interest at Maturity; and

    d.     Failure to timely file Quarterly and Annual Reports as required by the Exchange Act.

Such failures constituted a breach of Defendant Borrower's obligations and Events of Defaults under Article III of the Note and 4.g of the Agreement. Additionally, as a result of these defaults of the Defendant Borrower and its failure to abide by its contractual obligations to timely comply with the Exchange Act, the Plaintiff Holder has been deprived of and continues to be deprived of the opportunity to acquire and dispose of the Common Stock of the Defendant Borrower which profits are irretrievably lost because the markets for the common stock can no longer be recreated.

25.    Pursuant to Section 3.14 of the Note, Plaintiff Holder is entitled to recover "all costs, including, without limitation, legal fees and expenses, of collection." Section 3.14 of the Note is consistent with an award of attorney' s fee and expenses under the principles articulated in *Prospect Dev. Co. Inc. v. Bershader*, 258 Va. 75, 92 (1999). Pursuant thereto, demand is hereby made for the recovery of such costs of collection, including reasonable attorney's fees.

WHEREFORE, Plaintiff Holder demands a judgment in an amount to be determined by the Court but not less than an amount equal to the sum of: (i) the greater of $50,054.01 representing the principal of the Note, i.e., $33,369.40 times 150% along with accrued interest and default interest as well as the profit of which Plaintiff Holder has been deprived as a consequence of being unable to sell the shares received upon conversion; and (ii) $1,331,000 representing $2000.00 times 678 days accrued minus $25,000 until the issuance and delivery of the conversion of shares in proper form; together with applicable interest at the default rates set forth in the note. By reason of the foregoing Plaintiff Holder is entitled to judgement in the amount owed by the Defendant Borrower of at least together with accrued interest and accrued default interest and the lost profits that Plaintiff Holder would have realized had the stock been made available and delivered to Plaintiff Holder in accordance with its conversion rights as provided in the Note and the Agreement.

## COUNT II
## (FRAUD IN THE INDUCEMENT)

26.    Plaintiff Holder repeats and realleges each and every allegation contained in paragraphs 1- 25 of this Complaint with the same force and effect as if fully set forth at length herein.

27.    Plaintiff Holder made an investment in the aggregate amount of ($55,000.00) in Defendant Borrower as a result of the above-described transaction involving the Investment Contracts. Multiple Events of Defaults under the Note have occurred.

28.    Plaintiff Holder's willingness to assent to the terms of the investment and the Notes, and to enter into the Agreements and make the investment itself, was caused by the fraudulent misrepresentations of Defendant Borrower, including, but not limited to, the representation that Defendant Borrower would pay principal and interest upon Maturity, deliver Common Stock Prior to Deadline upon Plaintiff Holder's exercise of its conversion rights, Pay Principal and Interest upon Maturity, comply with the reporting requirements of the Securities Exchange Act of 1934 at all times, and maintain a Reserved Amount of Shares in accordance with its obligations under the Notes.

29.    Such representations were of a material fact, upon which the Plaintiff Holder relied, because Defendant Borrower would make it impossible for Plaintiff Holder to receive the expected benefit of its bargain, as Plaintiff Holder could not lawfully convert and sell the shares of Defendant's common stock as contemplated by the transaction documents.

30.    Upon information and belief, Defendant Borrower, acting in concert with others, intentionally made the foregoing misrepresentations for the purpose of misleading the Plaintiff Holder with the knowledge and intent that Defendant Borrower would not honor its obligations under the Notes and the Agreements.

31.     As a consequence of Defendant Borrower's misrepresentations, Plaintiff Holder has suffered the losses previously described herein.

32.     Defendant Borrower's conduct was fraudulent, oppressive, and/or recklessly committed with scienter, to induce Plaintiff Holder to invest in the Note.

33.     Additionally, pursuant to Section 3.14 Plaintiff Holder is entitled to recover "all costs, including, without limitation, legal fees and expenses, of collection." Additionally, Plaintiff Holder is entitled to an award of attorney' s fee and expenses under the principles articulated in *Prospect Dev. Co. Inc. v. Bershader*, 258 Va. 75 , 92 (1999). Pursuant thereto, demand is hereby made for the recovery of such costs of collection, including reasonable attorney's fees.

WHEREFORE, Plaintiff Holder demands a judgment in an amount to be determined by the Court but not less than $50,054.01 representing the Default Amount provided for in the Note for the Events of Default described herein, including all costs, including, without limitation, legal fees, expenses of collection, pre-judgment interest, default interest, and such other and further relief as to the Court may seem just and proper.

**COUNT III**
**(EQUITABLE RELIEF - SPECIFIC PERFORMANCE AND INJUNCTIVE RELIEF)**

34.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-33 of this Complaint with the same force and effect as if fully set forth at length herein.

35.     As set forth in the Investment Contracts, an essential element of the Investment Contracts between Plaintiff Holder and Defendant Borrower is the right of conversion because it was well known and expected by both parties that the Defendant Borrower would not have the cash or other resources to directly pay its obligations, but instead would rely upon the agreement that payment would be made by the conversion process.

36.     Pursuant to the Agreements and the Notes, so long as the Notes were outstanding, Defendant Borrower was required to maintain the Reserved Amount equal to six (6) times the number of shares that would be issuable upon full conversion of the Note. Further, and Defendant Borrower was required to comply with all Notices of Conversion and to deliver the stock required thereunder.

37.     The purpose of these provisions was to ensure that, in the event of a default in the Notes, the Plaintiff Holder would be able to convert the debt owed by the Defendant Borrower into free trading stock of the Defendant and to sell that stock on the open market.

38.     The covenants relating to Defendant Borrower's stock and the conversion features with respect to the loans made by Plaintiff to the Defendant were at all times essential conditions of the transactions, such that without such rights to convert into free trading stock in accordance with the loan documents, Plaintiff would not have made any of these loans. Accordingly, the Note and Purchase Agreement provided in pertinent part as follows:

> **Note**
>
> 4.8 Remedies. The Borrower acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Borrower acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Borrower of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, **to an injunction or injunctions** restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required.
>
> (Emphasis added.)
>
> See Exhibit 2 at p. 12.
>
> **Purchase Agreement**

8k. Remedies. The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Buyer by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Agreement will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Agreement, that the Buyer shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, **to an injunction or injunctions** restraining, preventing or curing any breach of this Agreement and to enforce specifically the terms and provisions hereof, without the necessity of showing economic loss and without any bond or other security being required.

(Emphasis added.)

See Exhibit 1 at p. 9.

39.     It is not possible to quantify the damages sustained by Plaintiff Holder based on the Defendant Borrower's willful refusal to maintain the Reserved Amount, which prevents Plaintiff Holder from exercising its conversion rights.

40.     The Defendant Borrower's willful failure to satisfy its obligation to fully deliver common stock prior to the Deadline upon Plaintiff's exercise of its conversion rights under the Note, as detailed above, has and will result in irreparable harm for which there is no adequate remedy of law.

41.     By reason of the foregoing, at the time that the loan documents were executed, the Defendant acknowledged and consented to the injunctive relief as set forth above.

42.     Accordingly, Plaintiff seeks an Order of this Court for an affirmative injunction directing the Defendant Borrower, and all of the Defendant's agents, servants and employees, including its present and future transfer agents, to specifically perform the Defendant Borrower's obligations under the Investment Contracts, including its obligations to satisfy its reporting requirements under the Exchange Act, to maintain the Reserved Amount to comply with

Plaintiffs Notice of Conversion set forth in Exhibit 8 and to process all Notices conversion until the total obligations owed to the Plaintiff are paid in full including all default amounts due under the Notes.

43.     Additionally, Plaintiff requests that the Court issue an injunction prohibiting the Defendant from issuing any further shares of stock whether common or preferred, so as not to dilute Plaintiff Holder's conversion rights or such process, until such time as the obligations owed by the Defendant Borrower to the Plaintiff Holder until the Note have been fully satisfied.

44.     For the reasons set forth above, the Plaintiff has no adequate remedy at law.

45.     Additionally, pursuant to Section 3.14 Plaintiff Holder is entitled to recover "all costs, including, without limitation, legal fees and expenses, of collection." Additionally, Plaintiff Holder is entitled to an award of attorney' s fee and expenses under the principles articulated in *Prospect Dev. Co. Inc. v. Bershader,* 258 Va. 75 , 92 (1999). Pursuant thereto, demand is hereby made for the recovery of such costs of collection, including reasonable attorney's fees.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Holder requests a bench trial to obtain a judgment against the Defendant as follows;

(1) As to count I, for a judgement in favor of the Plaintiff against the Defendant in the amount of the sum of (i) not less than an amount equal to the sum of: (A) the greater of $50,054.01 and the

profit of which Plaintiff Holder has been deprived as a consequence of being unable to sell the shares received upon conversion; and (B) $1,331,000 until the issuance and delivery of the conversion of shares to Plaintiff Holder; together with applicable interest thereon; plus (ii) the amount of lost profits to be determined by the Court but in no event less than $50,054.01; and (iii) Plaintiff Holder's reasonable legal fees and costs of this litigation as the Court may seem just and proper.

(2) As to Count II, for a judgement in favor of the Plaintiff Holder against the Defendant Borrower in the amount of $50,054.01 together with applicable interest thereon; together with Plaintiff Holder's reasonable legal fees and costs of this litigation.

(3) As to count III for an Order (i) ordering the specific performance of the Defendant Borrower's contractual obligations under the Note and Agreement; (ii) directing the Defendant Borrower to forthwith notify its transfer agent to increase the reserved amount of Shares of common stock with respect to the Note . (iii) directing the Defendant Borrower to forthwith issue and deliver to the Plaintiff 46,000 shares of Defendant's common stock that are the subject of Plaintiff's May 17, 2024 Notice of Conversion, free of any restrictive transfer legend; (iv) directing the Defendant Borrower to comply with all future notices of required increases in the Reserved Amount of Shares and Notices of Conversion and to issue such shares are required thereunder to comply with Defendant Borrower's obligations under the Note and Agreement, (v) enjoining Defendant Borrower from issuing any further stock whether common or preferred, so as not to dilute Plaintiff Holder's conversion process, until such time as the obligations owed by the Defendant Borrower to the Plaintiff Holder under the Note has been satisfied; and (vi) awarding Plaintiff its reasonable legal fees and costs in this litigation.

(4) As to each count, for an award of costs, prejudgment interest, default interest, and such other further relief as to the court may seem just and proper.

Dated: March 31, 2026

Respectfully Submitted

/s/Hayden Howlett
Hayden J. Howlett Esq
(Virginia Bar No. 97039)
SILVERPINE LAW PLLC
1629 K Street NW, Suite 300,
Washington DC 20006
*Counsel for Plaintiff*

**VERIFICATION**

State of ~~Virginia~~ Texas
County of ___Hidalgo___, to wit:

I, LEVAR BURTON, President of 13 Paul Lending LLC, being first duly sworn on oath, depose and say that I have read the foregoing pleadings by me subscribed and that the facts therein stated are true to the best of my knowledge, information and belief.

_____
Plaintiff

Subscribed and sworn to before me this 31st day of March, 2026.

_____
Clerk (or Notary Public)

State of Texas

County of Hidalgo

Sworn to and subscribed before me

on 03/31/2026 by Levar Raheem Burton.

Electronically signed and notarized online using the Proof platform.

Farooq Memon

_____
ID NUMBER
135544284
COMMISSION EXPIRES
December 23, 2029

## **EXHIBIT 1**
### **Purchase Agreement**

## SECURITIES PURCHASE AGREEMENT

This **SECURITIES PURCHASE AGREEMENT** (the "Agreement"), dated as of August 16, 2023, by and between **NovAccess Global Inc.**, a Colorado corporation, with its address at 8584 E. Washington Street #127,  Chagrin Falls, Ohio 44023 (the "Company"), and **13 PAUL LENDING LLC**, a Virginia limited liability company, with its address at 1322 Hillside Ave, Suite 115, Harrisonburg VA 22801 (the "Buyer").

**WHEREAS**:

A.      The Company and the Buyer are executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by the rules and regulations as promulgated by the United States Securities and Exchange Commission (the "SEC") under the Securities Act of 1933, as amended (the "1933 Act"); and

B.      Buyer desires to purchase and the Company desires to issue and sell, upon the terms and conditions set forth in this Agreement a convertible note of the Company, in the form attached hereto as Exhibit A, in the aggregate principal amount of $55,000.00 (together with any note(s) issued in replacement thereof or as a dividend thereon or otherwise with respect thereto in accordance with the terms thereof, the "Note"), convertible into shares of common stock, no par value per share, of the Company (the "Common Stock"), upon the terms and subject to the limitations and conditions set forth in such Note.

**NOW THEREFORE**, the Company and the Buyer hereby agree as follows:

1.   Purchase and Sale of Note.

    a.   Purchase of Note. On the Closing Date (as defined below), the Company shall issue and sell to the Buyer and the Buyer agrees to purchase from the Company such principal amount of Note as is set forth immediately below the Buyer's name on the signature pages hereto.

    b.   Form of Payment. On the Closing Date (as defined below), (i) the Buyer shall pay the purchase price for the Note to be issued and sold to it at the Closing (as defined below) (the "Purchase Price") by wire transfer of immediately available funds to the Company, in accordance with the Company's written wiring instructions, against delivery of the Note in the principal amount equal to the Purchase Price as is set forth immediately below the Buyer's name on the signature pages hereto, and (ii) the Company shall deliver such duly executed Note on behalf of the Company, to the Buyer, against delivery of such Purchase Price.

    c.   Closing Date. Subject to the satisfaction (or written waiver) of the conditions thereto set forth in Section 6 and Section 7 below, the date and time of the issuance and sale of the Note pursuant to this Agreement (the "Closing Date") shall be 12:00 noon, Eastern Standard Time on or about August 16, 2023, or such other mutually agreed upon time. The closing of the transactions contemplated by this Agreement (the "Closing") shall occur on the Closing Date at such location as may be agreed to by the parties.

2.   Buyer's Representations and Warranties. The Buyer represents and warrants to the Company that:

    a.   Investment Purpose. As of the date hereof, the Buyer is purchasing the Note and the shares of Common Stock issuable upon conversion of or otherwise pursuant to the Note (such shares of Common Stock being collectively referred to herein as the "Conversion Shares" and, collectively with the Note, the "Securities") for its own account and not with a present view towards the public sale or distribution thereof, except pursuant to sales registered or exempted from registration under the 1933 Act.

b.  <u>Accredited Investor Status</u>. The Buyer is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D (an "Accredited Investor").

c.  <u>Reliance on Exemptions</u>. The Buyer understands that the Securities are being offered and sold to it in reliance upon specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying upon the truth and accuracy of, and the Buyer's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Buyer set forth herein in order to determine the availability of such exemptions and the eligibility of the Buyer to acquire the Securities.

d.  <u>Information</u>. The Company has not disclosed to the Buyer any material nonpublic information and will not disclose such information unless such information is disclosed to the public prior to or promptly following such disclosure to the Buyer.

e.  <u>Legends</u>. The Buyer understands that the Note and, until such time as the Conversion Shares have been registered under the 1933 Act; or may be sold pursuant to an applicable exemption from registration, the Conversion Shares may bear a restrictive legend in substantially the following form:

> "THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE PLEDGED, SOLD, ASSIGNED, HYPOTHECATED OR OTHERWISE TRANSFERRED UNLESS (1) A REGISTRATION STATEMENT WITH RESPECT THERETO IS EFFECTIVE UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR (2) THE ISSUER OF SUCH SECURITIES RECEIVES AN OPINION OF COUNSEL TO THE HOLDER OF SUCH SECURITIES, WHICH COUNSEL AND OPINION ARE REASONABLY ACCEPTABLE TO THE ISSUER'S TRANSFER AGENT, THAT SUCH SECURITIES MAY BE PLEDGED, SOLD, ASSIGNED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS."

The legend set forth above shall be removed and the Company shall issue a certificate without such legend to the holder of any Security upon which it is stamped, if, unless otherwise required by applicable state securities laws, (a) such Security is registered for sale under an effective registration statement filed under the 1933 Act or otherwise may be sold pursuant to an exemption from registration without any restriction as to the number of securities as of a particular date that can then be immediately sold, or (b) such holder provides the Company with an opinion of counsel, in form, substance and scope customary for opinions of counsel in comparable transactions, to the effect that a public sale or transfer of such Security may be made without registration under the 1933 Act, which opinion shall be accepted by the Company so that the sale or transfer is effected. The Buyer agrees to sell all Securities, including those represented by a certificate(s) from which the legend has been removed, in compliance with applicable prospectus delivery requirements, if any. In the event that the Company does not accept the opinion of counsel provided by the Buyer with respect to the transfer of Securities pursuant to an exemption from registration, such as Rule 144, at the Deadline, it will be considered an Event of Default pursuant to Section 3.2 of the Note.

f.  <u>Authorization; Enforcement</u>. This Agreement has been duly and validly authorized. This Agreement has been duly executed and delivered on behalf of the Buyer, and this Agreement constitutes a valid and binding agreement of the Buyer enforceable in accordance with its terms.

2

3. <u>Representations and Warranties of the Company</u>. The Company represents and warrants to the Buyer that:

a. <u>Organization and Qualification</u>. The Company and each of its Subsidiaries (as defined below), if any, is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated, with full power and authority (corporate and other) to own, lease, use and operate its properties and to carry on its business as and where now owned, leased, used, operated and conducted. "Subsidiaries" means any corporation or other organization, whether incorporated or unincorporated, in which the Company owns, directly or indirectly, any equity or other ownership interest.

b. <u>Authorization; Enforcement</u>. (i) The Company has all requisite corporate power and authority to enter into and perform this Agreement, the Note and to consummate the transactions contemplated hereby and thereby and to issue the Securities, in accordance with the terms hereof and thereof, (ii) the execution and delivery of this Agreement, the Note by the Company and the consummation by it of the transactions contemplated hereby and thereby (including without limitation, the issuance of the Note and the issuance and reservation for issuance of the Conversion Shares issuable upon conversion or exercise thereof) have been duly authorized by the Company's Board of Directors and no further consent or authorization of the Company, its Board of Directors, or its shareholders is required, (iii) this Agreement has been duly executed and delivered by the Company by its authorized representative, and such authorized representative is the true and official representative with authority to sign this Agreement and the other documents executed in connection herewith and bind the Company accordingly, and (iv) this Agreement constitutes, and upon execution and delivery by the Company of the Note, each of such instruments will constitute, a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms.

c. <u>Capitalization</u>. As of the date hereof, the authorized common stock of the Company consists of 2,000,000,000 authorized shares of Common Stock, no par value per share, of which 21,535,457 shares are issued and outstanding. All of such outstanding shares of capital stock are duly authorized, validly issued, fully paid and non-assessable.

d. <u>Issuance of Shares</u>. The Conversion Shares are duly authorized and reserved for issuance and, upon conversion of the Note in accordance with its respective terms, will be validly issued, fully paid and non-assessable, and free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Company and will not impose personal liability upon the holder thereof.

e. <u>No Conflicts</u>. The execution, delivery and performance of this Agreement, the Note by the Company and the consummation by the Company of the transactions contemplated hereby and thereby (including, without limitation, the issuance and reservation for issuance of the Conversion Shares) will not (i) conflict with or result in a violation of any provision of the Certificate of Incorporation or By-laws, or (ii) violate or conflict with, or result in a breach of any provision of, or constitute a default (or an event which with notice or lapse of time or both could become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture, patent, patent license or instrument to which the Company or any of its Subsidiaries is a party, or (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws and regulations and regulations of any self-regulatory organizations to which the Company or its securities are subject) applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected (except for such conflicts, defaults, terminations, amendments, accelerations, cancellations and violations as would not, individually or in the aggregate, have a Material Adverse Effect). The businesses of the Company and its Subsidiaries, if any, are not being conducted, and shall not be conducted so long as the Buyer owns any of the Securities, in violation of any law, ordinance or regulation of any governmental entity. "Material Adverse Effect" means any material adverse effect on the business, operations, assets, financial condition or prospects of

3

the Company or its Subsidiaries, if any, taken as a whole, or on the transactions contemplated hereby or by the agreements or instruments to be entered into in connection herewith.

f.  <u>SEC Documents; Financial Statements</u>. The Company has filed all reports, schedules, forms, statements and other documents required to be filed by it with the SEC pursuant to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "1934 Act") (all of the foregoing filed prior to the date hereof and all exhibits included therein and financial statements and schedules thereto and documents (other than exhibits to such documents) incorporated by reference there in, being hereinafter referred to herein as the "SEC Documents"). Upon written request the Company will deliver to the Buyer true and complete copies of the SEC Documents, except for such exhibits and incorporated documents. As of their respective dates or if amended, as of the dates of the amendments, the SEC Documents complied in all material respects with the requirements of the 1934 Act and the rules and regulations of the SEC promulgated thereunder applicable to the SEC Documents, and none of the SEC Documents, at the time they were filed with the SEC, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. None of the statements made in any such SEC Documents is, or has been, required to be amended or updated under applicable law (except for such statements as have been amended or updated in subsequent filings prior the date hereof). As of their respective dates or if amended, as of the dates of the amendments, the financial statements of the Company included in the SEC Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto. Such financial statements have been prepared in accordance with United States generally accepted accounting principles, consistently applied, during the periods involved and fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments). The Company is subject to the reporting requirements of the 1934 Act.

g.  <u>Absence of Certain Changes</u>. Since June 30, 2023, except as set forth in the SEC Documents, there has been no material adverse change and no material adverse development in the assets, liabilities, business, properties, operations, financial condition, results of operations, prospects or 1934 Act reporting status of the Company or any of its Subsidiaries.

h.  <u>Absence of Litigation</u>. Except as set forth in the SEC Documents, there is no action, suit, claim, proceeding, inquiry or investigation before or by any court, public board, government agency, self-regulatory organization or body pending or, to the knowledge of the Company or any of its Subsidiaries, threatened against or affecting the Company or any of its Subsidiaries, or their officers or directors in their capacity as such, that could have a Material Adverse Effect. The Company and its Subsidiaries are unaware of any facts or circumstances which might give rise to any of the foregoing.

i.  <u>No Integrated Offering</u>. Neither the Company, nor any of its affiliates, nor any person acting on its or their behalf, has directly or indirectly made any offers or sales in any security or solicited any offers to buy any security under circumstances that would require registration under the 1933 Act of the issuance of the Securities to the Buyer. The issuance of the Securities to the Buyer will not be integrated with any other issuance of the Company's securities (past, current or future) for purposes of any shareholder approval provisions applicable to the Company or its securities.

j.  <u>No Brokers</u>. The Company has taken no action which would give rise to any claim by any person for brokerage commissions, transaction fees or similar payments relating to this Agreement or the transactions contemplated hereby.

k.  <u>No Investment Company</u>. The Company is not, and upon the issuance and sale of the Securities as contemplated by this Agreement will not be an "investment company" required to be registered under

4

the Investment Company Act of 1940 (an "Investment Company"). The Company is not controlled by an Investment Company.

l.   Breach of Representations and Warranties by the Company. If the Company breaches any of the representations or warranties set forth in this Section 3, and in addition to any other remedies available to the Buyer pursuant to this Agreement, it will be considered an Event of default under Section 3.4 of the Note.

4.   COVENANTS.

a.   Best Efforts. The Company shall use its best efforts to satisfy timely each of the conditions described in Section 7 of this Agreement.

b.   Form D; Blue Sky Laws. The Company agrees to timely make any filings required by federal and state laws as a result of the closing of the transactions contemplated by this Agreement.

c.   Use of Proceeds. The Company shall use the proceeds for general working capital purposes.

d.   Expenses. At the Closing, the Company's obligation with respect to the transactions contemplated by this Agreement is to reimburse Buyer in the amount of up to $2,200 in the aggregate for Buyer's legal fees and due diligence fee.

e.   Corporate Existence. So long as the Buyer beneficially owns any Note, the Company shall maintain its corporate existence and shall not sell all or substantially all of the Company's assets, except with the prior written consent of the Buyer.

f.   Breach of Covenants. If the Company breaches any of the covenants set forth in this Section 4 and in addition to any other remedies available to the Buyer pursuant to this Agreement, it will be considered an event of default under Section 3.4 of the Note.

g.   Failure to Comply with the 1934 Act. So long as the Buyer beneficially owns the Note, the Company shall comply with the reporting requirements of the 1934 Act; and the Company shall continue to be subject to the reporting requirements of the 1934 Act.

h.   Trading Activities. Neither the Buyer nor its affiliates has an open short position in the common stock of the Company and the Buyer agrees that it shall not, and that it will cause its affiliates not to, engage in any short sales of the common stock of the Company.

i.   The Buyer is Not a "Dealer". The Buyer and the Company hereby acknowledge and agree that the Buyer has not: (i) acted as an underwriter; (ii) acted as a market maker or specialist; (iii) acted as "de facto" market maker; or (iv) conducted any other professional market activities such as providing investment advice, extending credit, or lending securities in connection with the Company; and thus that the Buyer is not a "Dealer" as such term is defined in the 1934 Act.

5.   Transfer Agent Instructions. The Company shall issue irrevocable instructions to its transfer agent to issue certificates, registered in the name of the Buyer or its nominee, for the Conversion Shares in such amounts as specified from time to time by the Buyer to the Company upon conversion of the Note in accordance with the terms thereof (the "Irrevocable Transfer Agent Instructions"). In the event that the Company proposes to replace its transfer agent, the Company shall provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to this Agreement (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount as such term is defined in the Note) signed by the successor transfer agent to Company and the Company. Prior to registration of the Conversion Shares under the 1933 Act or the date on which the Conversion Shares may be sold pursuant

5

to an exemption from registration, all such certificates shall bear the restrictive legend specified in Section 2(e) of this Agreement. The Company warrants that: (i) no instruction other than the Irrevocable Transfer Agent Instructions referred to in this Section 5, will be given by the Company to its transfer agent and that the Securities shall otherwise be freely transferable on the books and records of the Company as and to the extent provided in this Agreement and the Note; (ii) it will not direct its transfer agent not to transfer, and will not delay, impair, and/or hinder its transfer agent in transferring (or issuing)(electronically or in certificated form) any certificate for Conversion Shares to be issued to the Buyer upon conversion of or otherwise pursuant to the Note as and when required by the Note and this Agreement; and (iii) it will not fail to remove (or direct its transfer agent not to remove or impair, delay, and/or hinder its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any Conversion Shares issued to the Buyer upon conversion of or otherwise pursuant to the Note as and when required by the Note and/or this Agreement. If the Buyer provides the Company and the Company's transfer agent, at the cost of the Buyer, with an opinion of counsel in form, substance and scope customary for opinions in comparable transactions, to the effect that a public sale or transfer of such Securities may be made without registration under the 1933 Act, the Company shall permit the transfer, and, in the case of the Conversion Shares, promptly instruct its transfer agent to issue one or more certificates, free from restrictive legend, in such name and in such denominations as specified by the Buyer. The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Buyer, by vitiating the intent and purpose of the transactions contemplated hereby. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section 5 may be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section, that the Buyer shall be entitled, in addition to all other available remedies, to an injunction restraining any breach and requiring immediate transfer, without the necessity of showing economic loss and without any bond or other security being required. Notwithstanding any contrary provision of Section 2(e) or of this Section 5, upon conversion, the Company shall provide an opinion of Company counsel to the Transfer Agent for the removal of any restrictive legend at no cost to Buyer, so long as Buyer is otherwise in compliance with the terms of this Agreement and eligible under Rule 144 and Buyer provides a customary certificate in support of such opinion to certify Buyer is not an "affiliate" as defined in Rule 144 and certify as to any other facts reasonably necessary for the issuance of such opinion by Company counsel.

6. <u>Conditions to the Company's Obligation to Sell</u>. The obligation of the Company hereunder to issue and sell the Note to the Buyer at the Closing is subject to the satisfaction, at or before the Closing Date of each of the following conditions thereto, provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion:

    a. The Buyer shall have executed this Agreement and delivered the same to the Company.

    b. The Buyer shall have delivered the Purchase Price in accordance with Section 1(b) above.

    c. The representations and warranties of the Buyer shall be true and correct in all material respects as of the Closing Date , and the Buyer shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Buyer at or prior to the Closing Date.

    d. No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

7. <u>Conditions to The Buyer's Obligation to Purchase</u>. The obligation of the Buyer hereunder to purchase the Note at the Closing is subject to the satisfaction, at or before the Closing Date (unless a later time is specified below) of each of the following conditions, provided that these conditions are for the Buyer's sole benefit and may be waived by the Buyer at any time in its sole discretion:

a.   The Company shall have executed this Agreement and delivered the same to the Buyer.

b.   The Company shall have delivered to the Buyer the duly executed Note (in such denominations as the Buyer shall request) in accordance with Section 1(b) above.

c.   The Irrevocable Transfer Agent Instructions, in form and substance satisfactory to the Buyer, shall have been delivered to and acknowledged in writing by the Company's Transfer Agent as soon as reasonably practicable but in any event no later than the fifth (5th) business day after the Closing Date.

d.   The representations and warranties of the Company shall be true and correct in all material respects as of the Closing Date (except for representations and warranties that speak as of a specific date) and the Company shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Company at or prior to the Closing Date. The Buyer shall have received a certificate or certificates, executed by the chief executive officer of the Company, dated as of the Closing Date, to the foregoing effect and as to such other matters as may be reasonably requested by the Buyer including, but not limited to certificates with respect to the Board of Directors' resolutions relating to the transactions contemplated hereby.

e.   No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

f.   No event shall have occurred which could reasonably be expected to have a Material Adverse Effect on the Company including but not limited to a change in the 1934 Act reporting status of the Company or the failure of the Company to be timely in its 1934 Act reporting obligations.

8.   Governing Law; Miscellaneous.

a.   Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the Circuit Court of Fairfax County, Virginia or in the Alexandria Division of the United States District Court for the Eastern District of Virginia. The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any objection or defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. The Company and Buyer waive trial by jury. The Buyer shall be entitled to recover from the Company its reasonable attorney's fees and costs incurred in connection with or related to any Event of Default by the Company, as defined in Article III of the Note. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement, the Note or any related document or agreement by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

b.   Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party.

c.   Headings. The headings of this Agreement are for convenience of reference only and shall not form part of, or affect the interpretation of, this Agreement.

7

d. <u>Severability</u>. In the event that any provision of this Agreement is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any provision hereof which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

e. <u>Entire Agreement; Amendments</u>. This Agreement and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor the Buyer makes any representation, warranty, covenant or undertaking with respect to such matters. No provision of this Agreement may be waived or amended other than by an instrument in writing signed by the Buyer.

f. <u>Notices</u>. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, (iv) via electronic mail or (v) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received) or delivery via electronic mail, or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

If to the Company, to:

NovAccess Global Inc.
8584 E. Washington Street #127
Chagrin Falls, Ohio 44023
Attn: Dwain K. Irvin, CEO
Email: dirvin@novaccessglobal.com

If to the Buyer:

13 Paul Lending, LLC
1322 Hillside Ave Suite 115,
Harrisonburg, VA 22801
Attn: Levar Burton, President

Each party shall provide notice to the other party of any change in address.

g. <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns. Neither the Company nor the Buyer shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other. Notwithstanding the foregoing, the Buyer may assign its rights hereunder to any person that purchases Securities in a private transaction from the Buyer or to any of its "affiliates," as that term is defined under the 1934 Act, without the consent of the Company.

h. <u>Survival</u>. The representations and warranties of the Company and the agreements and covenants set forth in this Agreement shall survive the closing hereunder notwithstanding any due diligence investigation

8

conducted by or on behalf of the Buyer. The Company agrees to indemnify and hold harmless the Buyer and all their officers, directors, employees and agents for loss or damage arising as a result of or related to any breach or alleged breach by the Company of any of its representations, warranties and covenants set forth in this Agreement or any of its covenants and obligations under this Agreement, including advancement of expenses as they are incurred.

i.   Further Assurances. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

j.   No Strict Construction. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

k.   Remedies. The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Buyer by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Agreement will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Agreement, that the Buyer shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Agreement and to enforce specifically the terms and provisions hereof, without the necessity of showing economic loss and without any bond or other security being required.

*[signature page follows]*

9

IN WITNESS WHEREOF, the undersigned Buyer and the Company have caused this Agreement to be duly executed as of the date first above written.

**NovAccess Global Inc.**

By: _Dwain Irvin_
BE01CC8FDC2B4A5...
Dwain K. Irvin
Chief Executive Officer

**13 PAUL LENDING LLC**

By: _Levar Burton_
50E6DA951654444...
Levar Burton
President and Sole Member/Manager

AGGREGATE SUBSCRIPTION AMOUNT:

$55,000.00

Aggregate Purchase Price:

Aggregate Principal Amount of Note:                        $55,000.00

**EXHIBIT 2**
**Note**

NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

**Principal Amount: $55,000.00**                                    **Issue Date: August 16, 2023**
**Purchase Price: $55,000.00**

## CONVERTIBLE PROMISSORY NOTE

**FOR VALUE RECEIVED**, **NovAccess Global Inc.**, a Colorado corporation (hereinafter called the "Borrower"), hereby promises to pay to the order of **13 Paul Lending LLC**, a Virginia limited liability company, or registered assigns (the "Holder") the sum of $55,000.00 together with any interest as set forth herein, on August 16, 2024 (the "Maturity Date"), and to pay interest on the unpaid principal balance here of at the rate of eight percent (8%) (the "Interest Rate") per annum from the date hereof (the "Issue Date") until the same becomes due and payable, whether at maturity or upon acceleration or by prepayment or otherwise. This Note may not be prepaid in whole or in part except as otherwise explicitly set forth herein. Any amount of principal or interest on this Note which is not paid when due shall bear interest at the rate of twenty two percent (22%) per annum from the due date thereof until the same is paid ("Default Interest"). Interest shall be computed on the basis of a 365 day year and the actual number of days elapsed. Interest shall commence accruing on the Issue Date but shall not be payable until the Note becomes payable (whether at Maturity Date or upon acceleration or by prepayment). All payments due hereunder (to the extent not converted into common stock, no par value per share (the "Common Stock") in accordance with the terms hereof) shall be made in lawful money of the United States of America. All payments shall be made at such address as the Holder shall hereafter give to the Borrower by written notice made in accordance with the provisions of this Note. Each capitalized term used herein, and not otherwise defined, shall have the meaning ascribed thereto in that certain Securities Purchase Agreement dated the date hereof, pursuant to which this Note was originally issued (the "Purchase Agreement").

This Note is free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Borrower and will not impose personal liability upon the holder thereof.

The following terms shall apply to this Note:

## ARTICLE I. CONVERSION RIGHTS

1.1 <u>Conversion Right</u>. The Holder shall have the right from time to time, and at any time during the period beginning on the date which is one hundred eighty (180) days following the date of this Note and ending on the later of: (i) the Maturity Date, or (ii) the date of payment of the Default Amount (as defined in Article III), each in respect of the remaining outstanding amount of this Note to convert all or any part of the outstanding and unpaid amount of this Note into fully paid and non-assessable shares of Common Stock, as such Common Stock exists on the Issue Date, or any shares of capital stock or other securities of the Borrower into which such Common Stock shall hereafter be changed or reclassified at the conversion price (the "Conversion Price") determined as provided herein (a "Conversion"); <u>provided</u>, <u>however</u>, that in no event shall the Holder be entitled to convert any portion of this Note in excess of that portion of this Note upon conversion of which the sum of (1) the number of shares of Common Stock beneficially owned by the Holder and its affiliates (other than shares of Common Stock which may be deemed beneficially owned through the ownership of the unconverted portion of the Notes or the unexercised or unconverted portion of any other security of the Borrower subject to a limitation on conversion or exercise analogous to the

limitations contained herein) and (2) the number of shares of Common Stock issuable upon the conversion of the portion of this Note with respect to which the determination of this proviso is being made, would result in beneficial ownership by the Holder and its affiliates of more than 4.99% of the outstanding shares of Common Stock. For purposes of the proviso to the immediately preceding sentence, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Regulations 13D-G thereunder, except as otherwise provided in clause (1) of such proviso. The beneficial ownership limitations on conversion as set forth in the section may NOT be waived by the Holder. The number of shares of Common Stock to be issued upon each conversion of this Note shall be determined by dividing the Conversion Amount (as defined below) by the applicable Conversion Price then in effect on the date specified in the notice of conversion, in the form attached hereto as Exhibit A (the "Notice of Conversion"), delivered to the Borrower by the Holder in accordance with Section 1.4 below; provided that the Notice of Conversion is submitted by facsimile or e-mail (or by other means resulting in, or reasonably expected to result in, notice) to the Borrower before 6:00 p.m., New York, New York time on such conversion date (the "Conversion Date"); however, if the Notice of Conversion is sent after 6:00pm, New York, New York time the Conversion Date shall be the next business day. The term "Conversion Amount" means, with respect to any conversion of this Note, the sum of (1) the principal amount of this Note to be converted in such conversion plus (2) at the Holder's option, accrued and unpaid interest, if any, on such principal amount at the interest rates provided in this Note to the Conversion Date, plus (3) at the Holder's option, Default Interest, if any, on the amounts referred to in the immediately preceding clauses (1) and/or (2) plus (4) at the Holder's option, any amounts owed to the Holder pursuant to Sections 1.4 hereof.

1.2     Conversion Price. The Conversion Price shall equal the Variable Conversion Price (as defined herein) (subject to equitable adjustments for stock splits, stock dividends or rights offerings by the Borrower relating to the Borrower's securities or the securities of any subsidiary of the Borrower, combinations, recapitalization, reclassifications, extraordinary distributions and similar events). The "Variable Conversion Price" shall mean 65% multiplied by the Market Price (as defined herein) (representing a discount rate of 35%). "Market Price" means the average of the three (3) lowest Trading Prices (as defined below) for the Common Stock during the fifteen (15) Trading Day period ending on the latest complete Trading Day prior to the Conversion Date. "Trading Price" means, for any security as of any date, the closing bid price on the OTCQB, OTCQX, Pink Sheets electronic quotation system or applicable trading market (the "OTC") as reported by a reliable reporting service ("Reporting Service") designated by the Holder (i.e. Bloomberg) or, if the OTC is not the principal trading market for such security, the closing bid price of such security on the principal securities exchange or trading market where such security is listed or traded or, if no closing bid price of such security is available in any of the foregoing manners, the average of the closing bid prices of any market makers for such security that are listed in the "pink sheets".  If the Trading Price cannot be calculated for such security on such date in the manner provided above, the Trading Price shall be the fair market value as mutually determined by the Borrower and the holders of a majority in interest of the Notes being converted for which the calculation of the Trading Price is required in order to determine the Conversion Price of such Notes. "Trading Day" shall mean any day on which the Common Stock is tradable for any period on the OTC, or on the principal securities exchange or other securities market on which the Common Stock is then being traded.

1.3     Authorized Shares. The Borrower covenants that during the period the conversion right exists, the Borrower will reserve from its authorized and unissued Common Stock a sufficient number of shares, free from preemptive rights, to provide for the issuance of Common Stock upon the full conversion of this Note issued pursuant to the Purchase Agreement. The Borrower is required at all times to have authorized and reserved six times the number of shares that would be issuable upon full conversion of the Note (assuming that the 4.99% limitation set forth in Section 1.1 is not in effect) (based on the respective Conversion Price of the Note (as defined in Section 1.2) in effect from time to time, initially 3,655,249 shares) (the "Reserved Amount"). The Reserved Amount shall be increased (or decreased with the written consent of the Holder) from time to time in accordance with the Borrower's obligations hereunder. The Borrower represents that upon issuance, such shares will be duly and validly issued, fully paid and non-assessable. In addition, if the Borrower shall issue any securities or make any change to its capital structure which would change the number of shares of Common Stock into which the Notes shall be convertible at the then current Conversion Price, the Borrower shall at the same time make proper provision so that thereafter there shall be a sufficient number of shares of Common Stock authorized and reserved, free from preemptive rights, for conversion of the outstanding Note. The Borrower (i) acknowledges that it has irrevocably instructed its transfer agent to issue certificates for the Common Stock issuable upon conversion of this Note, and (ii) agrees that its issuance of this Note shall

2

constitute full authority to its officers and agents who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for shares of Common Stock in accordance with the terms and conditions of this Note.

If, at any time the Borrower does not maintain the Reserved Amount it will be considered an Event of Default under Section 3.2 of the Note.

1.4    Method of Conversion.

(a)    Mechanics of Conversion. As set forth in Section 1.1 hereof, from time to time, and at any time during the period that the Note is outstanding, this Note may be converted by the Holder in whole or in part at any time from time to time after the Issue Date, by (A) submitting to the Borrower a Notice of Conversion (by facsimile, e-mail or other reasonable means of communication dispatched on the Conversion Date prior to 6:00 p.m., New York, New York time) and (B) subject to Section 1.4(b), surrendering this Note at the principal office of the Borrower (upon payment in full of any amounts owed hereunder). The Holder shall be entitled to deduct $500.00 from the conversion amount in each Notice of Conversion to cover Holder's deposit fees associated with each Notice of Conversion. Any additional expenses incurred by Holder with respect to the Borrower's transfer agent, for the issuance of the Common Stock into which this Note is convertible into, shall immediately and automatically be added to the balance of the Note at such time as the expenses are incurred by Holder.

(b)    Surrender of Note Upon Conversion. Notwithstanding anything to the contrary set forth herein, upon conversion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Borrower unless the entire unpaid principal amount of this Note is so converted. The Holder and the Borrower shall maintain records showing the principal amount so converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Borrower, so as not to require physical surrender of this Note upon each such conversion.

(c)    Delivery of Common Stock Upon Conversion. Upon receipt by the Borrower from the Holder of a facsimile transmission or e-mail (or other reasonable means of communication) of a Notice of Conversion meeting the requirements for conversion as provided in this Section 1.4, the Borrower shall issue and deliver or cause to be issued and delivered to or upon the order of the Holder certificates for the Common Stock issuable upon such conversion within three (3) business days after such receipt (the "Deadline") (and, solely in the case of conversion of the entire unpaid principal amount hereof, surrender of this Note) in accordance with the terms hereof and the Purchase Agreement. Upon receipt by the Borrower of a Notice of Conversion, the Holder shall be deemed to be the holder of record of the Common Stock issuable upon such conversion, the outstanding principal amount and the amount of accrued and unpaid interest on this Note shall be reduced to reflect such conversion, and, unless the Borrower defaults on its obligations hereunder, all rights with respect to the portion of this Note being so converted shall forthwith terminate except the right to receive the Common Stock or other securities, cash or other assets, as herein provided, on such conversion. If the Holder shall have given a Notice of Conversion as provided herein, the Borrower's obligation to issue and deliver the certificates for Common Stock shall be absolute and unconditional, irrespective of the absence of any action by the Holder to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against any person or any action to enforce the same, any failure or delay in the enforcement of any other obligation of the Borrower to the holder of record, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by the Holder of any obligation to the Borrower, and irrespective of any other circumstance which might otherwise limit such obligation of the Borrower to the Holder in connection with such conversion.

(d)    Delivery of Common Stock by Electronic Transfer. In lieu of delivering physical certificates representing the Common Stock issuable upon conversion, provided the Borrower is participating in the Depository Trust Company ("DTC") Fast Automated Securities Transfer ("FAST") program, upon request of the Holder and its compliance with the provisions set forth herein, the Borrower shall use its best efforts to cause its transfer agent to electronically transmit the Common Stock issuable upon conversion to the Holder by crediting the account of Holder's Prime Broker with DTC through its Deposit Withdrawal Agent Commission ("DWAC") system.

3

(e)     Failure to Deliver Common Stock Prior to Deadline. Without in any way limiting the Holder's right to pursue other remedies, including actual damages and/or equitable relief, the parties agree that if delivery of the Common Stock issuable upon conversion of this Note is not delivered by the Deadline due to action and/or inaction of the Borrower, the Borrower shall pay to the Holder $2,000 per day in cash, for each day beyond the Deadline that the Borrower fails to deliver such Common Stock (the "Fail to Deliver Fee"); provided; however that the Fail to Deliver Fee shall not be due if the failure is a result of a third party (i.e., transfer agent; and not the result of any failure to pay such transfer agent) despite the best efforts of the Borrower to effect delivery of such Common Stock. Such cash amount shall be paid to Holder by the fifth day of the month following the month in which it has accrued or, at the option of the Holder (by written notice to the Borrower by the first day of the month following the month in which it has accrued), shall be added to the principal amount of this Note, in which event interest shall accrue thereon in accordance with the terms of this Note and such additional principal amount shall be convertible into Common Stock in accordance with the terms of this Note. The Borrower agrees that the right to convert is a valuable right to the Holder. The damages resulting from a failure, attempt to frustrate, interference with such conversion right are difficult if not impossible to qualify. Accordingly, the parties acknowledge that the liquidated damages provision contained in this Section 1.4(e) are justified.

1.5     Concerning the Shares. The shares of Common Stock issuable upon conversion of this Note may not be sold or transferred unless: (i) such shares are sold pursuant to an effective registration statement under the Act or (ii) the Borrower or its transfer agent shall have been furnished with an opinion of counsel (which opinion shall be in form, substance and scope customary for opinions of counsel in comparable transactions) to the effect that the shares to be sold or transferred may be sold or transferred pursuant to an exemption from such registration (such as Rule 144 or a successor rule) ("Rule 144"); or (iii) such shares are transferred to an "affiliate" (as defined in Rule 144) of the Borrower who agrees to sell or otherwise transfer the shares only in accordance with this Section 1.5 and who is an Accredited Investor (as defined in the Purchase Agreement).

Any restrictive legend on certificates representing shares of Common Stock issuable upon conversion of this Note shall be removed and the Borrower shall issue to the Holder a new certificate therefore free of any transfer legend if the Borrower or its transfer agent shall have received an opinion of counsel from Holder's counsel (or from Company's counsel as provided in Section 5 of the Purchase Agreement), in form, substance and scope customary for opinions of counsel in comparable transactions, to the effect that (i) a public sale or transfer of such Common Stock may be made without registration under the Act, which opinion shall be accepted by the Company so that the sale or transfer is effected; or (ii) in the case of the Common Stock issuable upon conversion of this Note, such security is registered for sale by the Holder under an effective registration statement filed under the Act; or otherwise may be sold pursuant to an exemption from registration. In the event that the Company does not reasonably accept the opinion of counsel provided by the Holder with respect to the transfer of Securities pursuant to an exemption from registration (such as Rule 144), at the Deadline (or the Company fails to obtain its own Rule 144 opinion of counsel as contemplated in Section 5 at the Deadline), it will be considered an Event of Default pursuant to Section 3.2 of the Note.

1.6   Effect of Certain Events.

(a)     Effect of Merger, Consolidation, Etc. At the option of the Holder, the sale, conveyance or disposition of all or substantially all of the assets of the Borrower, the effectuation by the Borrower of a transaction or series of related transactions in which more than 50% of the voting power of the Borrower is disposed of, or the consolidation, merger or other business combination of the Borrower with or into any other Person (as defined below) or Persons when the Borrower is not the survivor shall be deemed to be an Event of Default (as defined in Article III) pursuant to which the Borrower shall be required to pay to the Holder upon the consummation of and as a condition to such transaction an amount equal to the Default Amount (as defined in Article III). "Person" shall mean any individual, corporation, limited liability company, partnership, association, trust or other entity or organization.

(b)     Adjustment Due to Merger, Consolidation, Etc. If, at any time when this Note is issued and outstanding and prior to conversion of all of the Note, there shall be any merger, consolidation, exchange of shares,

4

DocuSign Envelope ID: FD28FC89-5A70-4A20-9B80-23E6F818BE7E

recapitalization, reorganization, or other similar event, as a result of which shares of Common Stock of the Borrower shall be changed into the same or a different number of shares of another class or classes of stock or securities of the Borrower or another entity, or in case of any sale or conveyance of all or substantially all of the assets of the Borrower other than in connection with a plan of complete liquidation of the Borrower, then the Holder of this Note shall thereafter have the right to receive upon conversion of this Note, upon the basis and upon the terms and conditions specified herein and in lieu of the shares of Common Stock immediately theretofore issuable upon conversion, such stock, securities or assets which the Holder would have been entitled to receive in such transaction had this Note been converted in full immediately prior to such transaction (without regard to any limitations on conversion set forth herein), and in any such case appropriate provisions shall be made with respect to the rights and interests of the Holder of this Note to the end that the provisions hereof (including, without limitation, provisions for adjustment of the Conversion Price and of the number of shares issuable upon conversion of the Note) shall thereafter be applicable, as nearly as may be practicable in relation to any securities or assets thereafter deliverable upon the conversion hereof. The Borrower shall not affect any transaction described in this Section 1.6(b) unless (a) it first gives, to the extent practicable, ten (10) days prior written notice (but in any event at least five (5) days prior written notice) of the record date of the special meeting of shareholders to approve, or if there is no such record date, the consummation of, such merger, consolidation, exchange of shares, recapitalization, reorganization or other similar event or sale of assets (during which time the Holder shall be entitled to convert this Note) and (b) the resulting successor or acquiring entity (if not the Borrower) assumes by written instrument the obligations of this Note. The above provisions shall similarly apply to successive consolidations, mergers, sales, transfers or share exchanges.

(c)     Adjustment Due to Distribution. If the Borrower shall declare or make any distribution of its assets (or rights to acquire its assets) to holders of Common Stock as a dividend, stock repurchase, by way of return of capital or otherwise (including any dividend or distribution to the Borrower's shareholders in cash or shares (or rights to acquire shares) of capital stock of a subsidiary (i.e., a spin-off)) (a "Distribution"), then the Holder of this Note shall be entitled, upon any conversion of this Note after the date of record for determining shareholders entitled to such Distribution, to receive the amount of such assets which would have been payable to the Holder with respect to the shares of Common Stock issuable upon such conversion had such Holder been the holder of such shares of Common Stock on the record date for the determination of shareholders entitled to such Distribution.

1.7     Prepayment.  Notwithstanding anything to the contrary contained in this Note, at any time during the periods set forth on the table immediately following this paragraph (the "Prepayment Periods") or as otherwise agreed to between the Borrower and the Holder, the Borrower shall have the right, exercisable on not more than three (3) Trading Days prior written notice to the Holder of the Note to prepay the outstanding Note (principal and accrued interest), in full, in accordance with this Section 1.7. Any notice of prepayment hereunder (an "Optional Prepayment Notice") shall be delivered to the Holder of the Note at its registered addresses and shall state: (1) that the Borrower is exercising its right to prepay the Note, and (2) the date of prepayment which shall be not more than three (3) Trading Days from the date of the Optional Prepayment Notice. On the date fixed for prepayment (the "Optional Prepayment Date"), the Borrower shall make payment of the Optional Prepayment Amount (as defined below) to Holder, or upon the direction of the Holder as specified by the Holder in a writing to the Borrower (which shall direction to be sent to Borrower by the Holder at least one (1) business day prior to the Optional Prepayment Date). If the Borrower exercises its right to prepay the Note, the Borrower shall make payment to the Holder of an amount in cash equal to the percentage ("Prepayment Percentage") as set forth in the table immediately following this paragraph opposite the applicable Prepayment Period, multiplied by the sum of: (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the Optional Prepayment Date plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and (x) plus (z) any amounts owed to the Holder pursuant to Section 1.4 hereof (the "Optional Prepayment Amount").

5

| **Prepayment Period** | **Prepayment Percentage** |
|---|---|
| 1. The period beginning on the Issue Date and ending on the date which is thirty (30) days following the Issue Date. | 115% |
| 2. The period beginning on the date which is thirty-one (31) days from the Issue Date and ending sixty (60) days following the Issue Date. | 120% |
| 3. The period beginning on the date which is sixty-one (61) days from the Issue Date and ending one hundred eighty (180) days following the Issue Date. | 125% |

After the expiration of the Prepayment Periods set forth above, the Borrower may submit an Optional Prepayment Notice to the Holder. Upon receipt by the Holder of the Optional Prepayment Notice post Prepayment Periods, the prepayment shall be subject to the Holder's and the Borrower's agreement with respect to the applicable Prepayment Percentage.

Notwithstanding anything contained herein to the contrary, the Holder's conversion rights herein shall not be affected in any way until the Note is fully paid (funds received by the Holder) pursuant to an Optional Prepayment Notice.

### ARTICLE II. CERTAIN COVENANTS

2.1     Sale of Assets. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, sell, lease or otherwise dispose of any significant portion of its assets outside the ordinary course of business. Any consent to the disposition of any assets may be conditioned on a specified use of the proceeds of disposition.

### ARTICLE III. EVENTS OF DEFAULT AND REMEDIES

Each of the following events (3.1 through 3.13) is an "Event of Default" for purposes of this Note:

3.1     Failure to Pay Principal and Interest. The Borrower fails to pay the principal hereof or interest thereon when due on this Note, whether at maturity or upon acceleration and such breach continues for a period of five (5) days after written notice from the Holder.

3.2     Conversion and the Shares. The Borrower fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for three (3) business days after the Holder shall have delivered a Notice of Conversion. Additionally, it is an obligation of the Borrower to remain current in its obligations to its transfer agent, and it shall be an event of default of this Note if a conversion of this Note is delayed, hindered or frustrated due to a balance owed by the Borrower to its transfer agent. If at the option of the Holder, the Holder advances any funds to the Borrower's transfer agent in order to process a conversion, such advanced funds shall be paid by the Borrower to the Holder within forty-eight (48) hours of a demand from the Holder.

3.3     Breach of Covenants. The Borrower breaches any material covenant or other material term or condition contained in this Note and any collateral documents including but not limited to the Purchase Agreement and such breach continues for a period of twenty (20) days after written notice thereof to the Borrower from the Holder.

3.4     Breach of Representations and Warranties. Any representation or warranty of the Borrower made herein or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith (including, without limitation, the Purchase Agreement), shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement.

3.5     Receiver or Trustee. The Borrower or any subsidiary of the Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed.

3.6     Bankruptcy. Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Borrower or any subsidiary of the Borrower.

3.7     Delisting of Common Stock. The Borrower shall fail to maintain the listing of the Common Stock on at least one of the OTC (which specifically includes the quotation platforms maintained by the OTC Markets Group) or an equivalent replacement exchange, the Nasdaq National Market, the Nasdaq SmallCap Market, the New York Stock Exchange, or the American Stock Exchange.

3.8     Failure to Comply with the Exchange Act. The Borrower shall fail to comply with the reporting requirements of the Exchange Act; and/or the Borrower shall cease to be subject to the reporting requirements of the Exchange Act (whether through the filing of a Form 15 with the SEC or for any other reason).

3.9     Liquidation. Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business.

3.10    Cessation of Operations. Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due.

3.11    Financial Statement Restatement. The restatement of any financial statements filed by the Borrower with the SEC at any time after 180 days after the Issuance Date for any date or period until this Note is no longer outstanding, if the result of such restatement would, by comparison to the un-restated financial statement, have constituted a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement.

3.12    Replacement of Transfer Agent. In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount) signed by the successor transfer agent to Borrower and the Borrower.

3.13    Cross-Default. Notwithstanding anything to the contrary contained in this Note or the other related or companion documents, a breach or default by the Borrower of any covenant or other term or condition contained in any of the Other Agreements, after the passage of all applicable notice and cure or grace periods, shall, at the option of the Holder, be considered a default under this Note and the Other Agreements, in which event the Holder shall be entitled (but in no event required) to apply all rights and remedies of the Holder under the terms of this Note and the Other Agreements by reason of a default under said Other Agreement or hereunder. "Other Agreements" means, collectively, all agreements and instruments

7

between, among or by: (1) the Borrower, and, or for the benefit of, (2) the Holder and any affiliate of the Holder, including, without limitation, promissory notes; provided, however, the term "Other Agreements" shall not include the related or companion documents to this Note. Each of the loan transactions will be cross-defaulted with each other loan transaction and with all other existing and future debt of Borrower to the Holder.

3.14    Remedies.  Upon the occurrence and during the continuation of any Event of Default specified in Section 3.1 (solely with respect to failure to pay the principal hereof or interest thereon when due at the Maturity Date), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the Default Amount (as defined herein). UPON THE OCCURRENCE AND DURING THE CONTINUATION OF ANY EVENT OF DEFAULT SPECIFIED IN SECTION 3.2, THE NOTE SHALL BECOME IMMEDIATELY DUE AND PAYABLE AND THE BORROWER SHALL PAY TO THE HOLDER, IN FULL SATISFACTION OF ITS OBLIGATIONS HEREUNDER, AN AMOUNT EQUAL TO: (Y) THE DEFAULT AMOUNT (AS DEFINED HEREIN); MULTIPLIED BY (Z) TWO (2). Upon the occurrence and during the continuation of any Event of Default specified in Sections 3.1 (solely with respect to failure to pay the principal hereof or interest thereon when due on this Note upon acceleration), 3.3, 3.4, 3.7, 3.8, 3.10, 3.11, 3.12, and/or 3.13, exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice"), and upon the occurrence of an Event of Default specified in the remaining sections of Article III (other than failure to pay the principal hereof or interest thereon at the Maturity Date specified in Section 3.1 hereof), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to 150% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Prepayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and (x) plus (z) any amounts owed to the Holder pursuant to Section 1.3 hereof (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x), (y) and (z) shall collectively be known as the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity.

If the Borrower fails to pay the Default Amount within five (5) business days of written notice that such amount is due and payable, then the Holder shall have the right at any time, so long as the Borrower remains in default (and so long and to the extent that there are sufficient authorized shares), to require the Borrower, upon written notice, to immediately issue, in lieu of the Default Amount, the number of shares of Common Stock of the Borrower equal to the Default Amount divided by the Conversion Price then in effect.

### ARTICLE IV. MISCELLANEOUS

4.1    Failure or Indulgence Not Waiver.  No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges. All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

4.2    Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, facsimile or email, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second

8

business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

If to the Borrower, to:

NovAccess Global Inc.
8584 E. Washington Street, #127
Chagrin Falls, Ohio 44023
Attn: Dwain K. Irvin, Chief Executive Officer Fax:
Email: dirvin@novaccessglobal.com

If to the Holder:

13 PAUL LENDING LLC
1322 Hillside Ave, Suite 115
Harrisonburg VA 22801
Attn: Levar Burton, Manager
Email: lburton@bpaassetmanagement.com

4.3 Amendments. This Note and any provision hereof may only be amended by an instrument in writing signed by the Borrower and the Holder. The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument (and the other Notes issued pursuant to the Purchase Agreement) as originally executed, or if later amended or supplemented, then as so amended or supplemented.

4.4 Assignability. This Note shall be binding upon the Borrower and its successors and assigns, and shall inure to be the benefit of the Holder and its successors and assigns. Each transferee of this Note must be an "accredited investor" (as defined in Rule 501(a) of the Securities and Exchange Commission). Notwithstanding anything in this Note to the contrary, this Note may be pledged as collateral in connection with a bona fide margin account or other lending arrangement; and may be assigned by the Holder without the consent of the Borrower.

4.5 Cost of Collection. If default is made in the payment of this Note, the Borrower shall pay the Holder hereof costs of collection, including reasonable attorneys' fees.

4.6 Governing Law. This Note shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Note shall be brought only in the Circuit Court of Fairfax County, Virginia or in the Alexandria Division of the United States District Court for the Eastern District of Virginia. The parties to this Note hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any objection or defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. The Borrower and Holder waive trial by jury. The Holder shall be entitled to recover from the Borrower its reasonable attorney's fees and costs incurred in connection with or related to any Event of Default by the Company, as defined in Article III hereof.  In the event that any provision of this Note or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof or any agreement delivered in connection herewith. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Note, any agreement or any other document delivered in connection with this Note by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of

9

process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

4.7     Purchase Agreement. By its acceptance of this Note, each party agrees to be bound by the applicable terms of the Purchase Agreement.

4.8     Remedies. The Borrower acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Borrower acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Borrower of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required.

IN WITNESS WHEREOF, Borrower has caused this Note to be signed in its name by its duly authorized officer this on August 16, 2023.

Nov

*Dwain Irvin*

BE01CC8FDC2B4A5...

By Dwain K Irvin, Chief Executive Officer

12

10

**EXHIBIT A -- NOTICE OF CONVERSION**

The undersigned hereby elects to convert $_____ principal amount of the Note (defined below) into that number of shares of Common Stock to be issued pursuant to the conversion of the Note ("Common Stock") as set forth below, of NovAccess Global Inc., a Colorado corporation (the "Borrower") according to the conditions of the convertible note of the Borrower dated as of August 16, 2023 (the "Note"), as of the date written below. No fee will be charged to the Holder for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

[ ]    The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent At Custodian ("DWAC Transfer").

Name of DTC Prime Broker: Account
Number:

[ ]    The undersigned hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below or, if additional space is necessary, on an attachment hereto:

Date of conversion:

Applicable Conversion Price:                    $_____

Number of shares of common stock to be        _____
issued pursuant to conversion of the Notes:
Amount of Principal Balance due remaining      _____
under the Note after this conversion:

13 PAUL LENDING LLC

By:_____

Name: Levar Burton

Title: President and Sole Member/Manager

Date: _____

11

## EXHIBIT 3
### August 18, 2023 Transfer Agent Letter

# NovAccess Global Inc.

August 18, 2023

Securities Transfer Corporation
2901 Dallas Parkway - Suite 380
Plano, TX 75093

Ladies and Gentlemen:

NovAccess Global Inc. (the "*Company*") and 13 Paul Lending LLC (the "*Investor*") have entered into a Securities Purchase Agreement dated as of August 16, 2023 (the "*Agreement*") providing for the issuance of a Convertible Promissory Note in the principal amount of $55,000 (the "*Note*").

You are hereby irrevocably authorized and instructed to establish an initial reserve of 3,655,249 shares of common stock ("*Common Stock*") of the Company for issuance upon conversion of the Note in accordance with the terms thereof ("*Reserved Shares*"). Provided there are sufficient authorized but unissued shares to do so the Investor and the Company may together, in writing, periodically request that the number of Reserved Shares be increased pursuant to the board resolution authorizing this letter and the transactions underlying it. Each modification to the share reserve shall incur a $250 amendment fee. You are hereby further irrevocably authorized and directed to issue the shares of Common Stock so reserved upon your receipt from the Investor of a Notice of Conversion executed by the Investor in accordance with the terms of the Note, in each instance together with such other documents, including an opinion of counsel, satisfactory in your sole discretion to support the issuance. You shall have no duty or obligation to confirm the accuracy of the information set forth on any Notice of Conversion, but the Investor and Company understand that you reserve the right to do so in your sole discretion. Once the Company repays the principal, plus interest, plus default interest (if any) of the Note at the maturity date, upon written (e-mail being acceptable) confirmation by the Investor or Investor's counsel as well as the Company, you shall have no further obligation to maintain a reserve on behalf of the Investor or to issue any shares of common stock to the Investor under the terms of that Note.

You are hereby irrevocably instructed to issue the shares within three (3) business days upon receipt by you of a Notice of Conversion and all other documents or information required to be provided in connection with the issuance request including, if the shares are to be issued by DWAC, appropriate broker instructions to do so. The Company and Investor understand that you can only deliver the shares electronically via the Depository Trust & Clearing Company's Deposit Withdrawal At Custodian ("*DWAC*") program if the Company is participating in the DTCC's FAST/DWAC program, otherwise the shares will be issued in certificate form and will be sent via 1st class mail or courier. If the Company's account is on hold or the Company refuses to be billed for any charges related to this letter or the transaction underlying it, you agree to allow the Investor to prepay any charges related to the issuance of shares covered by this letter.

Such charges will be based on your then in force fee schedule and will include at a minimum, issuance fees, restriction removal fees, shipping fees and any other applicable fee then in force. In no event shall you be required to perform, do, take or not perform, do, or take any action without receiving payment in full for any such services. You are hereby irrevocably instructed that you shall, upon request of the Investor, provide the Investor with the number of shares of authorized capital and the number and class of any issued and outstanding capital shares of the Company.

The Company and the Investor intend that these instructions require the placement of a restrictive legend on all applicable share certificates unless the requirements listed below are met and the Investor provides you with a legal opinion, and other supporting documents satisfactory to you, in your sole discretion, stating the shares may be either be issued without a legend or that the legend may be removed from an already issued share certificate. So long as you have previously received such a legal opinion and other documentation from the Company (or Investor's counsel) that the shares have been registered under the 1933 Act or otherwise may be sold pursuant to Rule 144 without any restriction and the number of shares to be issued combined with the converting shareholder's existing holdings are less than 9.99% of the total issued and outstanding common stock of the Company, such shares should be transferred, at the option of the holder of the Note as specified in an instruction letter, a Notice of Conversion, either (i) electronically by crediting the account of a Prime Broker with the Depository Trust Company through its Deposit Withdrawal At Custodian system if the Company is a FAST participant or (ii) in certificated form without any legend which would restrict the transfer of the shares, and you should remove all stop-transfer instructions relating to such shares. Until such time as you are advised by Investor counsel that the shares have been registered under the 1933 Act or otherwise may be sold pursuant to Rule 144 without any restriction and the number of shares to be issued are less than 9.99% of the total issued and outstanding common stock of the Company, you are hereby instructed to place the following legends on the certificates:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THE SECURITIES MAY NOT BE SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER SAID ACT, OR AN OPINION OF COUNSEL IN FORM, SUBSTANCE AND SCOPE CUSTOMARY FOR OPINIONS OF COUNSEL IN COMPARABLE TRANSACTIONS AND SATISFACTORY TO THE TRANSFER AGENT, THAT REGISTRATION IS NOT REQUIRED OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SAID ACT.

The legend set forth above shall be removed and you are instructed to issue a certificate without such legend to the holder of any shares upon which it is stamped, if: (a) such shares are registered for sale under an effective registration statement filed under the 1933 Act or otherwise may be sold pursuant to Rule 144 without any restriction and the number of shares to be issued is less than 9.99% of the total issued common stock of the Company, (b) such holder provides the Company and you with an opinion of counsel, in form, substance and scope customary for

2

opinions of counsel in comparable transactions (and satisfactory to you in your sole discretion), to the effect that a public sale or transfer of such security may be made without registration under the 1933 Act and such sale or transfer is effected and (c) such holder provides the Company and you with reasonable assurances that such shares can be sold pursuant to Rule 144. Nothing herein shall be construed to require you, in your sole discretion, to take any action which would violate state or federal rules, regulations or law. If an instruction herein would require such a violation, such instructions, but not any other term herein, shall be void and unenforceable.

The Company shall indemnify and defend you and your officers, directors, principals, partners, agents and representatives, and hold each of them harmless from and against any and all loss, liability, damage, claim or expense (including the reasonable fees and disbursements of its and Transfer Agent's attorney) incurred by or asserted against you or any of them arising out of or in connection with the instructions set forth herein, the performance of your duties hereunder and otherwise in respect hereof, including the costs and expenses of defending yourself or themselves against any claim or liability hereunder including a claim by the Company, except that the Company shall not be liable hereunder as to matters in respect of which it is determined that you have acted with gross negligence or in bad faith (which gross negligence, bad faith or willful misconduct must be determined by a final, non-appealable order, judgment, decree or ruling of a court of competent jurisdiction). You shall have no liability to the Company or the Investor in respect to any action taken or any failure to act in respect of this if such action was taken or omitted to be taken in good faith, and you shall be entitled to rely in this regard on the advice of counsel.

The Investor and Company expressly understand and agree that nothing in this Irrevocable Transfer Instruction Agreement shall require or be construed in any way to require the transfer agent, in its sole discretion as the Transfer Agent, to do, take or not do or take any action that would be contrary to any Federal or State law, rule, or regulation including but expressly not limited to both the Securities Act of 1933 and the Securities and Exchange Act of 1934 as amended and the rules and regulations promulgated there under by the Securities and Exchange Commission.

The Company agrees that in the event you resign as the Company's transfer agent, the Company shall engage a suitable replacement transfer agent that will agree to serve as transfer agent for the Company and be bound by the terms and conditions of these Irrevocable Instructions within five (5) business days. Furthermore, if the Company decides to terminate you as Transfer Agent, the Company will provide a minimum of 30 days' notice of termination to you and the Company further agrees to immediately notify Investor that it has provided such notice to you. The Company and the Investor agree that any action which names you as a party shall be brought in a court of general jurisdiction in Collin County Texas, and no other court.

The Investor is intended to be a party to these instructions and are third party beneficiaries hereof, and no amendment or modification to the instructions set forth herein may be made without the consent of the Investor.

*[Remainder of page intentionally left blank; signature page follows]*

3

Very truly yours,

NOVACCESS GLOBAL INC.

_____

By Dwain K. Irvin, Chief Executive Officer

SECURITIES TRANSFER CORPORATION

_____

By:
Its:

4

**EXHIBIT 4**
**January 14, 2024 Email to Defendant**

**Levar Burton <lburton@bpaassetmanagement.com>**                    1/14/2024 3:54 PM

# Authorized shares increase/Debt confirmation request.

To dirvin@novaccessglobal.com

---

Hello Dwain, as you are probably aware your share price has decreased substantially from when we drafted the SPA and the amount of authorized shares.

I also received an email the other day from your auditor on the amount of interest accumulated on the loan so far.

I would appreciate it if you could answer a few questions:

Have you started the process of increasing your authorized shares?

What formula are you using to calculate the interest that has accrued so far?

When do you expect to file your quarterly report?

Sincerely,

Levar Burton

Cell ▉▉▉▉▉▉▉▉▉

**EXHIBIT 5**
**February 1, 2024 Notice of Default**

**Levar Burton <lburton@bpaassetmanagement.com>**        2/1/2024 7:20 PM

# Default Notice

To dirvin@novaccessglobal.com    Copy neil@novaccessglobal.com

---

Please direct this email message to Dwain K Morris-Irvin, CEO.  Please consider this email to be a "Default Notice" to NovAccess Global Inc., a Colorado corporation (hereinafter called the "Borrower") delivered by 13 PAUL LENDING LLC, a Virginia limited liability company ("Holder"), under the Convertible Promissory Note dated on or about August 16, 2023 in the original principal amount of $55,000 (the "Note").   Borrower is required to make all SEC filings required under the Securities Exchange Act of 1934 on a timely basis.  It has come to Holder's attention that Borrower has not filed its annual report for fiscal 2023 on Form 10-K.  Please further note that Holder hereby reserves any and all remedies available to it under the Note, and any remedies otherwise available at law or equity, including but not limited to acceleration and payment of certain amounts that are due under the Note and are subject to a 150% multiple under the terms of the Note.  Please contact me at your earliest convenience to discuss this matter.

**EXHIBIT 6**
**Form 8-K**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

# FORM 8-K

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the
### Securities Exchange Act of 1934

### February 1, 2024
(Date of earliest event reported)

# NovAccess Global Inc.
(Exact name of registrant as specified in its charter)

| **Colorado** | **000 29621** | **84 1384159** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

### 8584 E. Washington Street, No. 127, Chagrin Falls, Ohio 44023
(Address of principal executive offices) (Zip Code)

### 213 642 9268
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| None | N/A | N/A |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter). ☐ Emerging growth company

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.04  Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off Balance Sheet Arrangement.**

NovAccess Global Inc. ("NovAccess," the "company," "we" or "us") issued a convertible promissory note to 13 Paul Lending LLC on August 16, 2023. Pursuant to the note, 13 Paul Lending loaned NovAccess $55,000. The note has a provision that requires us to make all filings with the Securities and Exchange Commission required by the Securities Exchange Act of 1934. We have not filed the company's annual report for fiscal 2023 and are in default of this provision of the note. The note provides that if there is a default, 13 Paul Lending may accelerate the due date of the loan and require immediate payment of amounts outstanding under the note, multiplied by 150% as a penalty. On February 1, 2024, 13 Paul Lending notified us of the default and demanded payment of the note in full. There is currently $86,000 due under the note (150% of the $57,000 outstanding on the note).

We do not have the funds required to repay the note. If we do not make the payment, 13 Paul Lending will have the right to convert the amounts outstanding into shares of our common stock at a significant discount to the market price, in additional to other rights and remedies under the note. On December 29, 2023, to fund our long-term financial needs and repay debt, we entered into a securities purchase agreement with Sumner Global LLC, an affiliate of Sumner Investment Group Inc., pursuant to which Sumner agreed to purchase 33.0 million newly issued shares of our unregistered common stock for $0.11 a share, or $3.63 million in total, and to loan us $7.05 million. We had expected the equity portion of the Sumner transaction to close by January 31, 2023. However, the Sumner transaction has not yet closed, will not close in time for us to repay 13 Paul Lending on a timely basis, and is contingent upon Sumner obtaining the financing necessary to close. Based on Sumner's assurances, we expect the Sumner transaction to close shortly. For more information about the Sumner transaction, which is contingent on Sumner's financing, please see our December 29, 2023 Current Report on Form 8-K filed with the Securities and Exchange Commission.

We did not have the necessary funds to commence the audit of our financial statements for 2023, and as a result we were unable to timely file our annual report. On December 29, 2023, AJB Capital Investments, LLC loaned us the funds required to commence the audit and we now plan to file the 2023 annual report by February 12, 2024.

We do not have the funds necessary for continued operations or to repay our currently due debt. We cannot guarantee that we will be able to repay 13 Paul Lending, complete the Sumner transaction, or file our 2023 annual report and make other required filings.

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**NovAccess Global Inc.**

Dated: February 6, 2024

*/s/ Dwain K. Irvin*
By Dwain K. Irvin, Chief Executive Officer

**EXHIBIT 7**
**May 17, 2024 Conversion Notice**

**EXHIBIT A -- NOTICE OF CONVERSION**

The undersigned hereby elects to convert $7418.52 principal amount of the Note (defined below) into that number of shares of Common Stock to be issued pursuant to the conversion of the Note ("Common Stock") as set forth below, of NovAccess Global Inc., a Colorado corporation (the "Borrower") according to the conditions of the convertible note of the Borrower dated as of August 16, 2023 (the "Note"), as of the date written below. No fee will be charged to the Holder for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

[X] The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent At Custodian ("DWAC Transfer").

Name of DTC Prime Broker: Account Wilson-Davis
Number: 18005331

[X] The undersigned hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below or, if additional space is necessary, on an attachment hereto:

Date of conversion: May 17 2024

Applicable Conversion Price: $0.00344

Number of shares of common stock to be issued pursuant to conversion of the Notes: 2,300,000

Amount of Principal Balance due remaining under the Note after this conversion: $44,936.40

13 PAUL LENDING LLC

By:

Name: Levar Burton

Title: President and Sole Member/Manager

Date: May 17 2024

**EXHIBIT 8**
**June 2024 Transfer Agent Email and Brokerage Statement**

Case 1:26-cv-01010-LMB-WEF    Document 1    Filed 04/13/26    Page 58 of 61 PageID# 58

RE: EXTERNAL SENDER Book-Entry Statement

To Levar Burton <lburton@bpaassetmanagement.com>

---

We can do 2,254,205

Thank you,



Lost Securities Department

Operations Associate



Securities Transfer Corporation

2901 N. Dallas Parkway, Suite 380

Plano, Texas 75093

Phone (469) 633-0101

Fax    (469) 633-0088

www.stctransfer.com



---

**From:** Levar Burton <lburton@bpaassetmanagement.com>
**Sent:** Tuesday, June 4, 2024 12:39 PM
**To:** ████████████████████
**Subject:** RE: EXTERNAL SENDER Book-Entry Statement

Exactly how many shares are available?

On Jun 4, 2024 11:44, ███████████████████████ > wrote:

Levar are you modifying you request to 1,955,249 shares?

Thank you,



Lost Securities Department

Operations Associate

Securities Transfer Corporation

2901 N. Dallas Parkway, Suite 380

Plano, Texas 75093

Phone (469) 633-0101

Fax    (469) 633-0088

www.stctransfer.com



**From:** ████████████████████ >
**Sent:** Tuesday, June 4, 2024 10:23 AM
**To:** ██████████████████████ >
**Cc:** lburton@bpaassetmanagement.com
**Subject:** RE: EXTERNAL SENDER Book-Entry Statement

Good Morning ████████

The clearing firm, Wilson-Davsi, is currently out on the DWAC system for 13 Paul Lending's XSNX shares. If you are available, could you notify the DWAC department of the request?

Thank you,

████████████

Glendale Securities, Inc.

15233 Ventura Blvd., Suite 712

Sherman Oaks, CA 91403

https://glendalesecurities.com

P: (818) 907-1505 ext. 257

F: (818) 907-1506

---

**From:** ████████████████████████
**Sent:** Wednesday, May 29, 2024 2:44 PM
**To:** ████████████████████████
**Subject:** RE: Book-Entry Statement

Hi ████████

I can confirm the 2,300,000 are in the name of 13 Paul Lending and are ready to be DWAC transferred.

Thank you,

████████████

Lost Securities Department

Operations Associate

Securities Transfer Corporation

2901 N. Dallas Parkway, Suite 380

Plano, Texas 75093

Phone (469) 633-0101

Fax    (469) 633-0088

www.stctransfer.com

---

**From:** ████████████████████████████
**Sent:** Wednesday, May 29, 2024 11:49 AM
**To:** ████████████████████████
**Subject:** EXTERNAL SENDER Book-Entry Statement

Hello ████████████

I am working with Levar Burton on his XSNX shares. If you are available, could you please provide me with a copy of his book-entry statement showing his 2,300,000 XSNX shares?

Thank you,

███████

Glendale Securities, Inc.

15233 Ventura Blvd., Suite 712

Sherman Oaks, CA 91403

https://glendalesecurities.com

P: (818) 907-1505 ext. 257

F: (818) 907-1506

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

---

- image001.png (13 KB)
- image002.png (404 Byte)
- image003.png (662 Byte)
- image004.png (526 Byte)

**Glendale Securities**
15233 Ventura Blvd., Suite 712
Sherman Oaks, CA 91403
(818) 907-1505

:- 13 Paul Lending LLC

ACCOUNT NUMBER: 18005331
STATEMENT PERIOD: June 1 - 30, 2024

## :- Cash & Cash Equivalents 10.09%

| Description | Quantity | Market Price | Market Value | Adjusted Cost / Original Cost | Current Yield | Estimated Annual Income |
|---|---|---|---|---|---|---|
| **Cash** | | | | | | |
| US Dollar | 1,892.49 | 1.00 | 1,892.49 | 1,892.49 | 0.00 | 0.00 |
| Total Cash & Cash Equivalents | | | $1,892.49 | $1,892.49 | | $0.00 |

## :- Equities 89.91%

| Symbol | Description | Quantity | Market Price | Market Value | Unit Cost | Cost Basis | Unrealized Gain (Loss) | Div Yield % | Estimated Annual Income |
|---|---|---|---|---|---|---|---|---|---|
| XSNX | Novaccess Global Inc | 2,057,034 | 0.008 | 16,867.68 | N/A | N/A | N/A | | |
| | Total Equities | | | $16,867.68 | | $0.00 | $0.00 | | $0.00 |

## :- Account Activity Details

| Date | Description | CUSIP | Type of Activity | Quantity | Market Price | Net Settlement Amount |
|---|---|---|---|---|---|---|
| Jun 05 | Dwac Fee<br>Novaccess Global Inc | 67001N107 | Journal | | | (200.00) |
| Jun 05 | Novaccess Global Inc<br>1000-1 R/S Frm 98385I102 8/20 | 67001N107 | Security Receipt | 2,254,205 | | |
| Jun 06 | Novaccess Global Inc<br>1000-1 R/S Frm 98385I102 8/20 | 67001N107 | Sell | 51,422 | .012 | 661.71 |
| Jun 06 | Penny Stock Fee | | Journal | | | (7.26) |
| Jun 07 | Novaccess Global Inc<br>1000-1 R/S Frm 98385I102 8/20 | 67001N107 | Sell | 9,000 | .008 | 79.09 |
| Jun 07 | Penny Stock Fee | | Journal | | | (1.39) |
| Jun 07 | Penny Stock Fee | | Journal | | | (3.27) |
| Jun 10 | Novaccess Global Inc<br>1000-1 R/S Frm 98385I102 8/20 | 67001N107 | Sell | 22,000 | .012 | 264.26 |

Continued on next page